# DAVIS *v.* PASSMAN

No. 78-5072. Argued February 27, 1979—Decided June 5, 1979

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. BURGER, C. J., filed a dissenting opinion, in which POWELL and REHNQUIST, JJ., joined, *post*, p. 249. STEWART, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 251. POWELL, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 251.

*Sana F. Shtasel* argued the cause *pro hac vice* for petitioner. With her on the briefs were *Peter Barton Hutt* and *Jeffrey S. Berlin.*

*A. Richard Gear* argued the cause and filed a brief for respondent.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

*Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971), held that a "cause of action for damages" arises under

---

*Briefs of *amici curiae* urging reversal were filed by *Burt Neuborne* and *Bruce J. Ennis* for the American Civil Liberties Union; and by *Albert J. Beveridge III, Harold Himmelman,* and *Roderic V. O. Boggs* for Morris Udall et al.

the Constitution when Fourth Amendment rights are violated. The issue presented for decision in this case is whether a cause of action and a damages remedy can also be implied directly under the Constitution when the Due Process Clause of the Fifth Amendment is violated. The Court of Appeals for the Fifth Circuit, en banc, concluded that "no civil action for damages" can be thus implied. 571 F. 2d 793, 801 (1978). We granted certiorari, 439 U. S. 925 (1978), and we now reverse.

## I

At the time this case commenced, respondent Otto E. Passman was a United States Congressman from the Fifth Congressional District of Louisiana.[1] On February 1, 1974, Passman hired petitioner Shirley Davis as a deputy administrative assistant.[2] Passman subsequently terminated her employment, effective July 31, 1974, writing Davis that, although she was "able, energetic and a very hard worker," he had concluded "that it was essential that the understudy to my Administrative Assistant be a man."[3] App. 6.

---

[1] Passman was defeated in the 1976 primary election, and his tenure in office ended January 3, 1977.

[2] In her complaint, Davis avers that her "salary was $18,000.00 per year with the expectation of a promotion to defendant's administrative assistant at a salary of $32,000.00 per year upon the imminent retirement of defendant's current administrative assistant." App. 4.

Davis was not hired through the competitive service. See 2 U. S. C. § 92.

[3] The full text of Passman's letter is as follows:

Dear Mrs. Davis:

My Washington staff joins me in saying that we miss you very much. But, in all probability, inwardly they all agree that I was doing you an injustice by asking you to assume a responsibility that was so trying and so hard that it would have taken all of the pleasure out of your work. I must be completely fair with you, so please note the following:

You are able, energetic and a very hard worker. Certainly you command the respect of those with whom you work; however, on account of the unusually heavy work load in my Washington Office, and the diversity

Davis brought suit in the United States District Court for the Western District of Louisiana, alleging that Passman's conduct discriminated against her "on the basis of sex in violation of the United States Constitution and the Fifth Amendment thereto." *Id.*, at 4. Davis sought damages in the form of backpay. *Id.*, at 5.[4] Jurisdiction for her suit was founded on 28 U. S. C. § 1331 (a), which provides in pertinent part that federal "district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000 . . . and arises under the Constitution . . . of the United States . . . ."

---

of the job, I concluded that it was essential that the understudy to my Administrative Assistant be a man. I believe you will agree with this conclusion.

It would be unfair to you for me to ask you to waste your talent and experience in my Monroe office because of the low salary that is available because of a junior position. Therefore, and so that your experience and talent may be used to advantage in some organization in need of an extremely capable secretary, I desire that you be continued on the payroll at your present salary through July 31, 1974. This arrangement gives you your full year's vacation of one month, plus one additional month. May I further say that the work load in the Monroe office is very limited, and since you would come in as a junior member of the staff at such a low salary, it would actually be an offense to you.

I know that secretaries with your ability are very much in demand in Monroe. If an additional letter of recommendation from me would be advantageous to you, do not hesitate to let me know. Again, assuring you that my Washington staff and your humble Congressman feel that the contribution you made to our Washington office has helped all of us.

With best wishes,

Sincerely,
/s/ Otto E. Passman
OTTO E. PASSMAN
Member of Congress

App. 6–7.

[4] Davis also sought equitable relief in the form of reinstatement, as well as a promotion and salary increase. *Id.*, at 4–5. Since Passman is no longer a Congressman, however, see n. 1, *supra*, these forms of relief are no longer available.

Passman moved to dismiss Davis' action for failure to state a claim upon which relief can be granted, Fed. Rule Civ. Proc. 12 (b)(6), arguing, *inter alia,* that "the law affords no private right of action" for her claim.[5] App. 8. The District Court accepted this argument, ruling that Davis had "no private right of action." *Id.,* at 9.[6] A panel of the Court of Appeals for the Fifth Circuit reversed. 544 F. 2d 865 (1977). The. panel concluded that a cause of action for damages arose directly under the Fifth Amendment; that, taking as true the allegations in Davis' complaint, Passman's conduct violated the Fifth Amendment; and that Passman's conduct was not shielded by the Speech or Debate Clause of the Constitution, Art. I, § 6, cl. 1.[7]

The Court of Appeals for the Fifth Circuit, sitting en banc, reversed the decision of the panel. The en banc court did not reach the merits, nor did it discuss the application of the Speech or Debate Clause. The court instead held that "no right of action may be implied from the Due Process Clause of the fifth amendment." 571 F. 2d, at 801. The court reached this conclusion on the basis of the criteria that had been set out in *Cort* v. *Ash,* 422 U. S. 66 (1975), for determining whether a private cause of action should be implied from a federal statute.[8] Noting that Congress had failed to create a

---

[5] Passman also argued that his alleged conduct was "not violative of the Fifth Amendment to the Constitution," and that relief was barred "by reason of the sovereign immunity doctrine and the official immunity doctrine." App. 8.

[6] The District Court also ruled that, although "the doctrines of sovereign and official immunity" did not justify dismissal of Davis' complaint, "the discharge of plaintiff on alleged grounds of sex discrimination by defendant is not violative of the Fifth Amendment to the Constitution." *Id.,* at 9.

[7] The panel also held that, although sovereign immunity did not bar a damages award against Passman individually, he was entitled at trial to a defense of qualified immunity.

[8] The criteria set out in *Cort* v. *Ash* are:

"First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' *Texas & Pacific R. Co.* v. *Rigsby,* 241 U. S. 33, 39

damages remedy for those in Davis' position, the court also concluded that "the proposed damage remedy is not constitutionally compelled" so that it was not necessary to "countermand the clearly discernible will of Congress" and create such a remedy. 571 F. 2d, at 800.

## II

In *Bivens* v. *Six Unknown Fed. Narcotics Agents,* federal agents had allegedly arrested and searched Bivens without

(1916) (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? See, *e. g., National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers,* 414 U. S. 453, 458, 460 (1974) (*Amtrak*). Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? See, *e. g., Amtrak, supra; Securities Investor Protection Corp.* v. *Barbour,* 421 U. S. 412, 423 (1975); *Calhoon* v. *Harvey,* 379 U. S. 134 (1964). And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? See *Wheeldin* v. *Wheeler,* 373 U. S. 647, 652 (1963); cf. *J. I. Case Co.* v. *Borak,* 377 U. S. 426, 434 (1964); *Bivens* v. *Six Unknown Federal Narcotics Agents,* 403 U. S. 388, 394–395 (1971); *id.,* at 400 (Harlan, J., concurring in judgment)." 422 U. S., at 78.

The Court of Appeals had some difficulty applying these criteria to determine whether a cause of action should be implied under the Constitution. It eventually concluded, however, (1) that although "the fifth amendment right to due process certainly confers a right upon Davis, the injury alleged here does not infringe this right as directly as" the violation of the Fourth Amendment rights alleged in *Bivens,* 571 F. 2d, at 797; (2) that "[c]ongressional remedial legislation for employment discrimination has carefully avoided creating a cause of action for money damages for one in Davis' position," *id.,* at 798; (3) that, unlike violations of the Fourth Amendment, "the breadth of the concept of due process indicates that the damage remedy sought will not be judicially manageable," *id.,* at 799; and (4) that implying a cause of action under the Due Process Clause would create "the danger of deluging federal courts with claims otherwise redressable in state courts or administrative proceedings . . . ." *Id.,* at 800.

probable cause, thereby subjecting him to great humiliation, embarrassment, and mental suffering. *Bivens* held that the Fourth Amendment guarantee against "unreasonable searches and seizures" was a constitutional right which Bivens could enforce through a private cause of action, and that a damages remedy was an appropriate form of redress. Last Term, *Butz* v. *Economou,* 438 U. S. 478 (1978), reaffirmed this holding, stating that "the decision in *Bivens* established that a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official." *Id.,* at 504.

Today we hold that *Bivens* and *Butz* require reversal of the holding of the en banc Court of Appeals. Our inquiry proceeds in three stages. We hold first that, pretermitting the question whether respondent's conduct is shielded by the Speech or Debate Clause, petitioner asserts a constitutionally protected right; second, that petitioner has stated a cause of action which asserts this right; and third, that relief in damages constitutes an appropriate form of remedy.

## A

The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law . . . ." In numerous decisions, this Court "has held that the Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws. *E. g., Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 100 (1976); *Buckley* v. *Valeo,* 424 U. S. 1, 93 (1976); *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 638 n. 2 (1975); *Bolling* v. *Sharpe,* 347 U. S. 497, 500 (1954)." *Vance* v. *Bradley,* 440 U. S. 93, 95 n. 1 (1979). "To withstand scrutiny under the equal protection component of the Fifth Amendment's Due Process Clause, 'classifications by gender must serve important governmental objectives and must be

substantially related to achievement of those objectives.' *Craig* v. *Boren,* 429 U. S. 190, 197 (1976)." [9]    *Califano* v. *Webster,* 430 U. S. 313, 316–317 (1977).    The equal protection component of the Due Process Clause thus confers on petitioner a federal constitutional right [10] to be free from gender discrimination which cannot meet these requirements. [11]

---

[9] Before it can be determined whether petitioner's Fifth Amendment right has been violated, therefore, inquiry must be undertaken into what "important governmental objectives," if any, are served by the gender-based employment of congressional staff.    See n. 21, *infra.*    We express no views as to the outcome of this inquiry.

[10] This right is personal; it is petitioner, after all, who must suffer the effects of such discrimination.    See *Cannon* v. *University of Chicago,* 441 U. S. 677, 690–693, n. 13 (1979); cf. *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 326 (1893).

[11] Respondent argues that the subject matter of petitioner's suit is non-justiciable because judicial review of congressional employment decisions would necessarily involve a "lack of the respect due coordinate branches of government."    *Baker* v. *Carr,* 369 U. S. 186, 217 (1962).    We disagree. While we. acknowledge the gravity of respondent's concerns, we hold that judicial review of congressional employment decisions is constitutionally limited only by the reach of the Speech or Debate Clause of the Constitution, Art. I, § 6, cl. 1.    The Clause provides that Senators and Representatives, "for any Speech or Debate in either House, . . . shall not be questioned in any other Place."    It protects Congressmen for conduct necessary to perform their duties "within the 'sphere of legitimate legislative activity.'"    *Eastland* v. *United States Servicemen's Fund,* 421 U. S. 491, 501 (1975).    The purpose of the Clause is "to protect the integrity of the legislative process by insuring the independence of individual legislators."    *United States* v. *Brewster,* 408 U. S. 501, 507 (1972).    Thus "[i]n the American governmental structure the clause serves the . . . function of reinforcing the separation of powers so deliberately established by the Founders."    *United States* v. *Johnson,* 383 U. S. 169, 178 (1966). The Clause is therefore a paradigm example of "a textually demonstrable constitutional commitment of [an] issue to a coordinate political department."    *Baker* v. *Carr, supra,* at 217.    Since the Speech or Debate Clause speaks so directly to the separation-of-powers concerns raised by respondent, we conclude that if respondent is not shielded by the Clause, the question whether his dismissal of petitioner violated her Fifth Amend-

We inquire next whether petitioner has a cause of action to assert this right.

## B

It is clear that the District Court had jurisdiction under 28 U. S. C. § 1331 (a) to consider petitioner's claim. *Bell* v. *Hood,* 327 U. S. 678 (1946). It is equally clear, and the en banc Court of Appeals so held, that the Fifth Amendment confers on petitioner a constitutional right to be free from illegal discrimination.[12] Yet the Court of Appeals concluded

---

ment rights would, as we stated in *Powell* v. *McCormack,* 395 U. S. 486, 548–549 (1969), "require no more than an interpretation of the Constitution. Such a determination falls within the traditional role accorded courts to interpret the law, and does not involve a 'lack of respect due [a] co-ordinate branch of government,' nor does it involve an 'initial policy determination of a kind clearly for non-judicial discretion.' *Baker* v. *Carr,* 369 U. S. 186, at 217."

The en banc Court of Appeals did not decide whether the conduct of respondent was shielded by the Speech or Debate Clause. In the absence of such a decision, we also intimate no view on this question. We note, however, that the Clause shields federal legislators with absolute immunity "not only from the consequences of litigation's results but also from the burden of defending themselves." *Dombrowski* v. *Eastland,* 387 U. S. 82, 85 (1967). Defenses based upon the Clause should thus ordinarily be given priority, since federal legislators should be exempted from litigation if their conduct is in fact protected by the Clause. We nevertheless decline to remand this case to the en banc Court of Appeals before we have decided whether petitioner's complaint states a cause of action, and whether a damages remedy is an appropriate form of relief. These questions are otherwise properly before us and may be resolved without imposing on respondent additional litigative burdens. Refusal to decide them at this time may actually increase these burdens.

[12] The restraints of the Fifth Amendment reach far enough to embrace the official actions of a Congressman in hiring and dismissing his employees. That respondent's conduct may have been illegal does not suffice to transform it into merely private action. "[P]ower, once granted, does not disappear like a magic gift when it is wrongfully used." *Bivens,* 403 U. S., at 392. See *Home Tel. & Tel. Co.* v. *Los Angeles,* 227 U. S. 278, 287–289 (1913).

that petitioner could not enforce this right because she lacked a cause of action. The meaning of this missing "cause of action," however, is far from apparent.

Almost half a century ago, Mr. Justice Cardozo recognized that a " 'cause of action' may mean one thing for one purpose and something different for another." *United States* v. *Memphis Cotton Oil Co.,* 288 U. S. 62, 67–68 (1933).[13] The phrase apparently became a legal term of art when the New York Code of Procedure of 1848 abolished the distinction between actions at law and suits in equity and simply required a plaintiff to include in his complaint "[a] statement of the facts constituting the cause of action . . . ."[14] 1848 N. Y. Laws, ch. 379, § 120 (2). By the first third of the 20th century, however, the phrase had become so encrusted with doctrinal complexity that the authors of the Federal Rules of Civil Procedure eschewed it altogether, requiring only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8 (a). See *Original Ballet Russe, Ltd.* v. *Ballet Theatre, Inc.,* 133 F. 2d 187, 189 (CA2 1943). Nevertheless, courts and commentators have continued to use the phrase "cause of action" in the traditional sense established by the Codes to refer roughly to the alleged invasion of "recognized legal rights" upon which a litigant bases his claim for relief.[15]

---

[13] See *United States* v. *Dickinson,* 331 U. S. 745, 748 (1947); Arnold, The Code "Cause of Action" Clarified by United States Supreme Court, 19 A. B. A. J. 215 (1933).

[14] See Clark, The Code Cause of Action, 33 Yale L. J. 817, 820 (1924); Blume, The Scope of a Civil Action, 42 Mich. L. Rev. 257 (1943).

[15] See, *e. g., United States* v. *Employing Plasterers Assn.,* 347 U. S. 186 (1954); 2A J. Moore, Federal Practice ¶ 8.13, pp. 1704–1705 (2d ed. 1975) ("Perhaps it is not entirely accurate to say, as one court has said, that 'it is only necessary to state a claim in the pleadings . . . and not a cause of action.' While the Rules have substituted 'claim' or 'claim for relief' in lieu of the older and troublesome term 'cause of action,' the pleading still must state a 'cause of action' in the sense that it must show 'that the pleader is

*Larson* v. *Domestic & Foreign Commerce Corp.*, 337 U. S. 682, 693 (1949).

This is not the meaning of the "cause of action" which the Court of Appeals below refused to imply from the Fifth Amendment, however, for the court acknowledged that petitioner had alleged an invasion of her constitutional right to be free from illegal discrimination.[16]  Instead the Court of Appeals appropriated the meaning of the phrase "cause of action" used in the many cases in which this Court has parsed congressional enactments to determine whether the rights and obligations so created could be judicially enforced by a particular "class of litigants." *Cannon* v. *University of Chicago*, 441 U. S. 677, 688 (1979). *Securities Investor Protection Corp.* v. *Barbour*, 421 U. S. 412 (1975), for example, held that although "Congress' primary purpose in . . . creating the SIPC was . . . the protection of investors," and although investors were thus "the intended beneficiaries of the [Securities Investor Protection] Act [of 1970]," 84 Stat. 1636,

---

entitled to relief.' It is not enough to indicate merely that the plaintiff has a grievance but sufficient detail must be given so that the defendant, and the court, can obtain a fair idea of what the plaintiff is complaining, and can see that there is some legal basis for recovery") (footnotes omitted).

There was, of course, great controversy concerning the exact meaning of the phrase "cause of action" in the Codes. See 2 J. Moore, Federal Practice ¶ 2.06, p. 359 n. 26 (2d ed. 1978); J. Pomeroy, Code Remedies 459–466 (4th ed. 1904); Wheaton, The Code "Cause of Action": Its Definition, 22 Cornell L. Q. 1 (1936); Clark, *supra* n. 14, at 837.

[16] The Court of Appeals apparently found that petitioner lacked a "cause of action" in the sense that a cause of action would have been supplied by 42 U. S. C. § 1983. *Chapman* v. *Houston Welfare Rights Org.*, 441 U. S. 600 (1979), holds this Term that, although § 1983 serves "to ensure that an individual [has] a cause of action for violations of the Constitution," the statute itself "does not provide any substantive rights at all." *Id.*, at 617, 618. Section 1983, of course, provides a cause of action only for deprivations of constitutional rights that occur "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory," and thus has no application to this case.

15 U. S. C. § 78aaa *et seq.*, investors nevertheless had no private cause of action judicially to compel SIPC "to commit its funds or otherwise to act for the protection" of investors. 421 U. S., at 418, 421. We held that under the Act only the Securities and Exchange Commission had a cause of action enabling it to invoke judicial authority to require SIPC to perform its statutory obligations. On the other hand, *Texas & N. O. R. Co.* v. *Railway & Steamship Clerks,* 281 U. S. 548 (1930), held that § 2 of the Railway Labor Act of 1926, 44 Stat. 577, 45 U. S. C. § 152, which provides that railroad employees be able to designate representatives "without interference, influence, or coercion," did not confer "merely an abstract right," but was judicially enforceable through a private cause of action.[17] 281 U. S., at 558, 567–568.

In cases such as these, the question is which class of litigants may enforce in court legislatively created rights or obligations. If a litigant is an appropriate party to invoke the power of the courts, it is said that he has a "cause of action" under the statute, and that this cause of action is a necessary element of his "claim." So understood, the question whether a litigant has a "cause of action" is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive. The concept of a "cause of action" is employed specifically to determine who may judicially enforce the statutory rights or obligations.[18]

---

[17] *Texas & N. O. R. Co.* v. *Railway & Steamship Clerks* is now understood as having implied a "cause of action" although the opinion itself did not use the phrase. See *Cannon* v. *University of Chicago,* 441 U. S., at 690–693, n. 13.

[18] Thus it may be said that *jurisdiction* is a question of whether a federal court has the power, under the Constitution or laws of the United States, to hear a case, see *Mansfield, C. & L. M. R. Co.* v. *Swan,* 111 U. S. 379, 384 (1884); *Montana-Dakota Utilities Co.* v. *Northwestern Public Serv. Co.,* 341 U. S. 246, 249 (1951); *standing* is a question of whether a plaintiff is sufficiently adversary to a defendant to create an Art. III case or controversy, or

It is in this sense that the Court of Appeals concluded that petitioner lacked a cause of action. The Court of Appeals reached this conclusion through the application of the criteria set out in *Cort* v. *Ash,* 422 U. S. 66 (1975), for ascertaining whether a private cause of action may be implied from "a

at least to overcome prudential limitations on federal-court jurisdiction, see *Warth* v. *Seldin,* 422 U. S. 490, 498 (1975); *cause of action* is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court; and *relief* is a question of the various remedies a federal court may make available. A plaintiff may have a cause of action even though he be entitled to no relief at all, as, for example, when a plaintiff sues for declaratory or injunctive relief although his case does not fulfill the "preconditions" for such equitable remedies. See *Trainor* v. *Hernandez,* 431 U. S. 434, 440–443 (1977).

The Court of Appeals appeared to confuse the question of whether petitioner had standing with the question of whether she had asserted a proper cause of action. See *National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers,* 414 U. S. 453, 465 n. 13 (1974). Although the court acknowledged the existence of petitioner's constitutional right, 571 F. 2d, at 797–798, it concluded that she had no cause of action in part because "the injury alleged here does not infringe this right as directly as the injury inflicted in the unreasonable search of Webster Bivens offended the fourth amendment." *Id.,* at 797. The nature of petitioner's injury, however, is relevant to the determination of whether she has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker* v. *Carr,* 369 U. S., at 204. See *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.,* 438 U. S. 59, 72 (1978). And under the criteria we have set out, petitioner clearly has standing to bring this suit. If the allegations of her complaint are taken to be true, she has shown that she "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone, Realtors* v. *Village of Bellwood,* 441 U. S. 91, 99 (1979). Whether petitioner has asserted a cause of action, however, depends not on the quality or extent of her injury, but on whether the class of litigants of which petitioner is a member may use the courts to enforce the right at issue. The focus must therefore be on the nature of the right petitioner asserts.

statute not expressly providing one." *Id.*, at 78.[19]  The Court of Appeals used these criteria to determine that those in petitioner's position should not be able to enforce the Fifth Amendment's Due Process Clause, and that petitioner therefore had no cause of action under the Amendment. This was error, for the question of who may enforce a *statutory* right is fundamentally different from the question of who may enforce a right that is protected by the Constitution.

Statutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition who may enforce them and in what manner. For example, statutory rights and obligations are often embedded in complex regulatory schemes, so that if they are not enforced through private causes of action, they may nevertheless be enforced through alternative mechanisms, such as criminal prosecutions, see *Cort* v. *Ash, supra,* or other public causes of actions. See *Securities Investor Protection Corp.* v. *Barbour, supra; National Railroad Passenger Corp.* v. *National Assn. of Railroad Passengers,* 414 U. S. 453, 457 (1974). In each case, however, the question is the nature of the legislative intent informing a specific statute, and *Cort* set out the criteria through which this intent could be discerned.

The Constitution, on the other hand, does not "partake of the prolixity of a legal code." *McCulloch* v. *Maryland,* 4 Wheat. 316, 407 (1819). It speaks instead with a majestic simplicity. One of "its important objects," *ibid.,* is the designation of rights. And in "its great outlines," *ibid.,* the judiciary is clearly discernible as the primary means through which these rights may be enforced. As James Madison stated when he presented the Bill of Rights to the Congress:

> "If [these rights] are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardians of those rights; they

---

[19] See n. 8, *supra.*

242

will be an impenetrable bulwark against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights." 1 Annals of Cong. 439 (1789).

At least in the absence of "a textually demonstrable constitutional commitment of [an] issue to a coordinate political department," *Baker* v. *Carr,* 369 U. S. 186, 217 (1962), we presume that justiciable constitutional rights are to be enforced through the courts. And, unless such rights are to become merely precatory, the class of those litigants who allege that their own constitutional rights have been violated, and who at the same time have no effective means other than the judiciary to enforce these rights, must be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights. "The very essence of civil liberty," wrote Mr. Chief Justice Marshall in *Marbury* v. *Madison,* 1 Cranch 137, 163 (1803), "certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." Traditionally, therefore, "it is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution and to restrain individual state officers from doing what the 14th Amendment forbids the State to do." *Bell* v. *Hood,* 327 U. S., at 684. See *Bivens,* 403 U. S., at 400 (Harlan, J., concurring in judgment). Indeed, this Court has already settled that a cause of action may be implied directly under the equal protection component of the Due Process Clause of the Fifth Amendment in favor of those who seek to enforce this constitutional right.[20] The plaintiffs in *Bolling* v. *Sharpe,* 347 U. S. 497

[20] *Jacobs* v. *United States,* 290 U. S. 13 (1933), held that a plaintiff who alleged that his property had been taken by the United States for public

(1954), for example, claimed that they had been refused admission into certain public schools in the District of Columbia solely on account of their race. They rested their suit directly on the Fifth Amendment and on the general federal-question jurisdiction of the district courts, 28 U. S. C. § 1331. The District Court dismissed their complaint for failure "to state a claim upon which relief can be granted." Fed. Rule Civ. Proc. 12 (b)(6). This Court reversed. Plaintiffs were clearly the appropriate parties to bring such a suit, and this Court held that equitable relief should be made available. 349 U. S. 294 (1955).

Like the plaintiffs in *Bolling* v. *Sharpe, supra,* petitioner rests her claim directly on the Due Process Clause of the Fifth Amendment. She claims that her rights under the Amendment have been violated, and that she has no effective means other than the judiciary to vindicate these rights.[21]

---

use without just compensation could bring suit directly under the Fifth Amendment.

[21] Clause 9 of Rule XLIII of the House of Representatives prohibits sex discrimination as part of the Code of Official Conduct of the House:

"A Member, officer, or employee of the House of Representatives shall not discharge or refuse to hire any individual, or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

Clause 9 was adopted on January 14, 1975, see 121 Cong. Rec. 22, approximately six months after petitioner's discharge. In 1977, the House Commission on Administrative Review ("Obey Commission") termed "the anti-discrimination provisions of Rule XLIII . . . all but unenforceable." House Commission on Administrative Review, Recommendations and Rationales Concerning Administrative Units and Work Management, 95th Cong., 1st Sess., 53 (Comm. Print 1977). The Commission recommended the establishment of a Fair Employment Practices Panel to provide non-binding conciliation in cases of alleged violations of Clause 9. See H. Res. 766, 95th Cong., 1st Sess., § 504 (1977); Commission on Administrative Review, *supra,* at 52–53. This proposal was prevented from reaching the House floor, however, when the House defeated the Rule which

We conclude, therefore, that she is an appropriate party to invoke the general federal-question jurisdiction of the District Court to seek relief. She has a cause of action under the Fifth Amendment.[22]

Although petitioner has a cause of action, her complaint might nevertheless be dismissed under Rule 12 (b)(6) unless it can be determined that judicial relief is available. We therefore proceed to consider whether a damages remedy is an appropriate form of relief.

---

would have governed consideration of the Obey Commission's resolution. See 123 Cong. Rec. 33435–33444 (Oct. 12, 1977).

On September 25, 1978, H. Res. 1380 was introduced calling for the implementation of Clause 9 through the creation of "a House Fair Employment Relations Board, a House Fair Employment Relations Office, and procedures for hearing and settling complaints alleging violations of Clause 9 of Rule XLIII . . . ." H. Res. 1380, 95th Cong., 2d Sess., § 2 (1978). H. Res. 1380 was referred to the House Committees on Administration and Rules, where it apparently languished. See 124 Cong. Rec. 31334 (Sept. 25, 1978). The House failed to consider it before adjournment.

There presently exists a voluntary House Fair Employment Practices Agreement. Members of the House who have signed the Agreement elect a House Fair Employment Practices Committee, which has authority to investigate cases of alleged discrimination among participating Members. The Committee has no enforcement powers.

[22] Five Courts of Appeals have implied causes of action directly under the Fifth Amendment. See *Apton* v. *Wilson,* 165 U. S. App. D. C. 22, 506 F. 2d 83 (1974); *Sullivan* v. *Murphy,* 156 U. S. App. D. C. 28, 478 F. 2d 938 (1973); *United States ex rel. Moore* v. *Koelzer,* 457 F. 2d 892 (CA3 1972); *Loe* v. *Armistead,* 582 F. 2d 1291 (CA4 1978), cert. pending *sub nom. Moffit* v. *Loe,* No. 78–1260; *States Marine Lines, Inc.* v. *Shultz,* 498 F. 2d 1146 (CA4 1974); *Green* v. *Carlson,* 581 F. 2d 669 (CA7 1978), cert. pending, No. 78–1261; *Jacobson* v. *Tahoe Regional Planning Agency,* 566 F. 2d 1353 (CA9 1977), reversed in part and affirmed in part on other grounds *sub nom. Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency,* 440 U. S. 391 (1979); *Bennett* v. *Campbell,* 564 F. 2d 329 (CA9 1977).

## C

We approach this inquiry on the basis of established law. "[I]t is . . . well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." *Bell* v. *Hood,* 327 U. S., at 684. *Bivens,* 403 U. S., at 396, holds that in appropriate circumstances a federal district court may provide relief in damages for the violation of constitutional rights if there are "no special factors counselling hesitation in the absence of affirmative action by Congress." See *Butz* v. *Economou,* 438 U. S., at 504.

First, a damages remedy is surely appropriate in this case. "Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." *Bivens, supra,* at 395. Relief in damages would be judicially manageable, for the case presents a focused remedial issue without difficult questions of valuation or causation. See 403 U. S., at 409 (Harlan, J., concurring in judgment). Litigation under Title VII of the Civil Rights Act of 1964 has given federal courts great experience evaluating claims for backpay due to illegal sex discrimination. See 42 U. S. C. § 2000e–5 (g). Moreover, since respondent is no longer a Congressman, see n. 1, *supra,* equitable relief in the form of reinstatement would be unavailing. And there are available no other alternative forms of judicial relief. For Davis, as for Bivens, "it is damages or nothing." [23] *Bivens, supra,* at 410 (Harlan, J., concurring in judgment).

---

[23] Respondent does not dispute petitioner's claim that she "has no cause of action under Louisiana law." Brief for Petitioner 19. See 3 CCH Employment Practices ¶ 23,548 (Aug. 1978). And it is far from clear that a state court would have authority to effect a damages remedy against a United States Congressman for illegal actions in the course of his official conduct, even if a plaintiff's claim were grounded in the United States Constitution. See *Tarble's Case,* 13 Wall. 397 (1872). Deference to

Second, although a suit against a Congressman for putatively unconstitutional actions taken in the course of his official conduct does raise special concerns counseling hesitation, we hold that these concerns are coextensive with the protections afforded by the Speech or Debate Clause.[24] See n. 11, *supra.* If respondent's actions are not shielded by the Clause, we apply the principle that "legislators ought . . . generally to be bound by [the law] as are ordinary persons." *Gravel* v. *United States,* 408 U. S. 606, 615 (1972). Cf. *Doe* v. *McMillan,* 412 U. S. 306, 320 (1973). As *Butz* v. *Economou* stated only last Term:

> "Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law:
>
> " 'No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it.' *United States* v. *Lee,* 106 U. S. [196,] 220 [(1882)]." 438 U. S., at 506.[25]

Third, there is in this case "no *explicit* congressional declara-

state-court adjudication in a case such as this would in any event not serve the purposes of federalism, since it involves the application of the Fifth Amendment to a federal officer in the course of his federal duties. It is therefore particularly appropriate that a federal court be the forum in which a damages remedy be awarded.

[24] The reasoning and holding of *Bivens* is pertinent to the determination whether a federal court may provide a damages remedy. The question of the appropriateness of equitable relief in the form of reinstatement is not in this case, and we consequently intimate no view on that question.

[25] The decision of the panel of the Court of Appeals for the Fifth Circuit found that respondent was not foreclosed "from asserting the same qualified immunity available to other government officials. See generally *Wood* v. *Strickland,* 420 U. S. 308 . . . (1975); *Scheuer* v. *Rhodes,* 416 U. S. 232 . . . (1974)." 544 F. 2d 865, 881 (1977). The en banc Court of Appeals did not reach this issue, and accordingly we express no view concerning its disposition by the panel.

tion that persons" in petitioner's position injured by unconstitutional federal employment discrimination "may not recover money damages from" those responsible for the injury. *Bivens, supra,* at 397. (Emphasis supplied.) The Court of Appeals apparently interpreted § 717 of Title VII of the Civil Rights Act of 1964, 86 Stat. 111, 42 U. S. C. § 2000e–16, as an explicit congressional prohibition against judicial remedies for those in petitioner's position. When § 717 was added to Title VII to protect federal employees from discrimination, it failed to extend this protection to congressional employees such as petitioner who are not in the competitive service.[26] See 42 U. S. C. § 2000e–16 (a). There is no evidence, however, that Congress meant § 717 to foreclose alternative remedies available to those not covered by the statute. Such silence is far from "the clearly discernible will of Congress" perceived by the Court of Appeals. 571 F. 2d, at 800. Indeed, the Court of Appeals' conclusion that § 717 permits judicial relief to be made available only to those who are protected by the statute is patently inconsistent with *Hampton* v. *Mow Sun Wong,* 426 U. S. 88 (1976), which held that equitable relief was available in a challenge to the constitutionality of Civil Service Commission regulations excluding aliens from federal employment. That § 717 does not prohibit discrimination on the basis of alienage [27] did not prevent *Hampton* from authorizing relief. In a similar manner, we do not now interpret § 717 to foreclose the judicial remedies of those expressly unprotected by the statute. On the contrary, § 717 leaves undisturbed whatever remedies petitioner might otherwise possess.

---

[26] Since petitioner was not in the competitive service, see n. 2, *supra,* the remedial provisions of § 717 of Title VII are not available to her. In *Brown* v. *GSA,* 425 U. S. 820 (1976), we held that the remedies provided by § 717 are exclusive when those federal employees covered by the statute seek to redress the violation of rights guaranteed by the statute.

[27] Section 717 prohibits discrimination on the basis of "race, color, religion, sex, or national origin." 42 U. S. C. § 2000e–16 (a).

Finally, the Court of Appeals appeared concerned that, if a damages remedy were made available to petitioner, the danger existed "of deluging federal courts with claims . . . ." 571 F. 2d, at 800. We do not perceive the potential for such a deluge. By virtue of 42 U. S. C. § 1983, a damages remedy is already available to redress injuries such as petitioner's when they occur under color of state law. Moreover, a plaintiff seeking a damages remedy under the Constitution must first demonstrate that his constitutional rights have been violated. We do not hold that every tort by a federal official may be redressed in damages. See *Wheeldin* v. *Wheeler*, 373 U. S. 647 (1963). And, of course, were Congress to create equally effective alternative remedies, the need for damages relief might be obviated. See *Bivens*, 403 U. S., at 397. But perhaps the most fundamental answer to the concerns expressed by the Court of Appeals is that provided by Mr. Justice Harlan concurring in *Bivens:*

> "Judicial resources, I am well aware, are increasingly scarce these days. Nonetheless, when we automatically close the courthouse door solely on this basis, we implicitly express a value judgment on the comparative importance of classes of legally protected interests. And current limitations upon the effective functioning of the courts arising from budgetary inadequacies should not be permitted to stand in the way of the recognition of otherwise sound constitutional principles." *Id.*, at 411.

We conclude, therefore, that in this case, as in *Bivens*, if petitioner is able to prevail on the merits, she should be able to redress her injury in damages, a "remedial mechanism normally available in the federal courts." *Id.*, at 397.

### III

We hold today that the Court of Appeals for the Fifth Circuit, en banc, must be reversed because petitioner has a

cause of action under the Fifth Amendment, and because her injury may be redressed by a damages remedy. The Court of Appeals did not consider, however, whether respondent's conduct was shielded by the Speech or Debate Clause of the Constitution. Accordingly, we do not reach this question. And, of course, we express no opinion as to the merits of petitioner's complaint.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST join, dissenting.

I dissent because, for me, the case presents very grave questions of separation of powers, rather than Speech or Debate Clause issues, although the two have certain common roots. Congress could, of course, make *Bivens*-type remedies available to its staff employees—and to other congressional employees—but it has not done so. On the contrary, Congress has historically treated its employees differently from the arrangements for other Government employees. Historically, staffs of Members have been considered so intimately a part of the policymaking and political process that they are not subject to being selected, compensated, or tenured as others who serve the Government. The vulnerability of employment on congressional staffs derives not only from the hazards of elections but also from the imperative need for loyalty, confidentiality, and political compatibility—not simply to a political party, an institution, or an administration, but to the individual Member.

A Member of Congress has a right to expect that every person on his or her staff will give total loyalty to the political positions of the Member, total confidentiality, and total support. This may, on occasion, lead a Member to employ a

particular person on a racial, ethnic, religious, or gender basis thought to be acceptable to the constituency represented, even though in other branches of Government—or in the private sector—such selection factors might be prohibited. This might lead a Member to decide that a particular staff position should be filled by a Catholic or a Presbyterian or a Mormon, a Mexican-American or an Oriental-American—or a woman rather than a man. Presidents consciously select—and dispense with—their appointees on this basis and have done so since the beginning of the Republic. The very commission of a Presidential appointee defines the tenure as "during the pleasure of the President."

Although Congress altered the ancient "spoils system" as to the Executive Branch and prescribed standards for some limited segments of the Judicial Branch, it has allowed its own Members, Presidents, and Judges to select their personal staffs without limit or restraint—in practical effect their tenure is "during the pleasure" of the Member.

At this level of Government—staff assistants of Members—long-accepted concepts of separation of powers dictate, for me, that until Congress legislates otherwise as to employment standards for its own staffs, judicial power in this area is circumscribed. The Court today encroaches on that barrier. Cf. *Sinking-Fund Cases*, 99 U. S. 700, 718 (1879).

In relation to his or her constituents, and in the performance of constitutionally defined functions, each Member of the House or Senate occupies a position in the Legislative Branch comparable to that of the President in the Executive Branch; and for the limited purposes of selecting personal staffs, their authority should be uninhibited except as Congress itself, or the Constitution, expressly provides otherwise.

The intimation that if Passman were still a Member of the House, a federal court could command him, on pain of contempt, to re-employ Davis represents an astonishing break with concepts of separate, coequal branches; I would categor-

ically reject the notion that courts have any such power in relation to the Congress.

MR. JUSTICE STEWART, with whom MR. JUSTICE REHNQUIST joins, dissenting.

Few questions concerning a plaintiff's complaint are more basic than whether it states a cause of action. The present case, however, involves a preliminary question that may be completely dispositive, for, as the Court recognizes, "the [Speech or Debate] Clause shields federal legislators with absolute immunity 'not only from the consequences of litigation's results but also from the burden of defending themselves.' *Dombrowski* v. *Eastland*, 387 U. S. 82, 85 (1967)." *Ante*, at 236 n. 11. See also *Eastland* v. *United States Servicemen's Fund*, 421 U. S. 491, 503.

If, therefore, the respondent's alleged conduct was within the immunity of the Speech or Debate Clause, that is the end of this case, regardless of the abstract existence of a cause of action or a damages remedy. Accordingly, it seems clear to me that the first question to be addressed in this litigation is the Speech or Debate Clause claim—a claim that is far from frivolous.

I would vacate the judgment and remand the case to the Court of Appeals with directions to decide the Speech or Debate Clause issue.*

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

Although I join the opinion of THE CHIEF JUSTICE, I write separately to emphasize that no prior decision of this Court justifies today's intrusion upon the legitimate powers of Members of Congress.

---

*This issue was fully briefed and argued before the en banc Court of Appeals. The court's opinion gives no indication of why the court did not decide it.

The Court's analysis starts with the general proposition that "the judiciary is clearly discernible as the primary means through which [constitutional] rights may be enforced," *ante,* at 241. It leaps from this generalization, unexceptionable itself, to the conclusion that individuals who have suffered an injury to a constitutionally protected interest, and who lack an "effective" alternative, *"must* be able to invoke the existing jurisdiction of the courts for the protection of their justiciable constitutional rights." *Ante,* at 242 (emphasis supplied). Apart from the dubious logic of this reasoning, I know of no precedent of this Court that supports such an absolute statement of the federal judiciary's obligation to entertain private suits that Congress has not authorized. On the contrary, I have thought it clear that federal courts must exercise a principled discretion when called upon to infer a private cause of action directly from the language of the Constitution. In the present case, for reasons well summarized by THE CHIEF JUSTICE, principles of comity and separation of powers should require a federal court to stay its hand.

To be sure, it has been clear—at least since *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971)—that in appropriate circumstances private causes of action may be inferred from provisions of the Constitution.[1] But the exercise of this responsibility involves discretion, and a weighing of relevant concerns. As Mr. Justice Harlan observed in addressing this very point, a court should "take into account [a range of policy considerations] at least as broad as the range of those a legislature would consider with respect to an express statutory authorization of a traditional remedy." *Id.,* at 407.

---

[1] A court necessarily has wider latitude in interpreting the Constitution than it does in construing a statute, *McCulloch* v. *Maryland,* 4 Wheat. 316, 407 (1819). Moreover, the federal courts have a far greater responsibility under the Constitution for the protection of those rights derived directly from it, than for the definition and enforcement of rights created solely by Congress. *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S., at 407 (Harlan, J., concurring in judgment).

Among those policies that a court certainly should consider in deciding whether to imply a constitutional right of action is that of comity toward an equal and coordinate branch of government.[2]   As Mr. Chief Justice Waite observed over a century ago: "One branch of government cannot encroach on the domain of another without danger.   The safety of our institutions depends in no small degree on a strict observance of this salutary rule."   *Sinking-Fund Cases,* 99 U. S. 700, 718 (1879). Even where the authority of one branch over a matter is not exclusive, so that a federal court properly may accept jurisdiction over the dispute, we have recognized that the principle of separation of powers continues to have force as a matter of policy.   For example, in *United States* v. *Nixon,* 418 U. S. 683 (1974), we held on the one hand that the question whether the President had a claim of privilege as to conversations with his advisers was an issue to be resolved by the judiciary, and on the other hand that separation-of-powers considerations required the recognition of a qualified privilege.

---

[2] It is settled that where discretion exists, a variety of factors rooted in the Constitution may lead a federal court to refuse to entertain an otherwise properly presented constitutional claim.   See, *e. g., Trainor* v. *Hernandez,* 431 U. S. 434 (1977); *Juidice* v. *Vail,* 430 U. S. 327 (1977); *Huffman* v. *Pursue, Ltd.,* 420 U. S. 592 (1975); *Younger* v. *Harris,* 401 U. S. 37 (1971); *Alabama Public Service Comm'n* v. *Southern R. Co.,* 341 U. S. 341 (1951); *Douglas* v. *City of Jeannette,* 319 U. S. 157 (1943); *Burford* v. *Sun Oil Co.,* 319 U. S. 315 (1943); *Railroad Comm'n* v. *Pullman Co.,* 312 U. S. 496 (1941); *Hawks* v. *Hamill,* 288 U. S. 52 (1933). Traditionally, the issue has arisen in the context of a federal court's exercise of its equity powers with respect to the States.   Concerns of comity similar to those that govern our dealings with the States also come into play when we are asked to interfere with the functioning of Congress.

The Court suggests that because the Speech or Debate Clause of the Constitution embodies a separation-of-powers principle, the Constitution affords no further protection to the prerogatives of Members of Congress. *Ante,* at. 246.   This assertion not only marks a striking departure from precedent, but also constitutes a non sequitur.   Our constitutional structure of government rests on a variety of checks and balances; the existence of one such check does not negate all others.

Whether or not the employment decisions of a Member of Congress fall within the scope of the Speech or Debate Clause of the Constitution, a question the Court does not reach today,[3] it is clear that these decisions are bound up with the conduct of his duties. As THE CHIEF JUSTICE observes, *ante,* at 249, a Congressman necessarily relies heavily on his personal staff in discharging the duties of his office. Because of the nature of his office, he must rely to an extraordinary extent on the loyalty and compatibility of everyone who works for him. Cf. *Elrod* v. *Burns,* 427 U. S. 347, 377–388 (1976) (POWELL, J., dissenting). A Congressman simply cannot perform his constitutional duties effectively, or serve his constituents properly, unless he is supported by a staff in which he has total confidence.

The foregoing would seem self-evident even if Congress had not indicated an intention to reserve to its Members the right to select, employ, promote, and discharge staff personnel without judicial interference. But Congress unmistakably has made clear its view on this subject. It took pains to exempt itself from the coverage of Title VII. Unless the Court is abandoning or modifying *sub silentio* our holding in *Brown* v. *GSA,* 425 U. S. 820 (1976)', that Title VII, as amended, "provides the exclusive judicial remedy for claims of discrimination in federal employment," *id.,* at 835, the exemption from this statute for congressional employees should bar all judicial relief.

In sum, the decision of the Court today is not an exercise of principled discretion. It avoids our obligation to take into

---

[3] It is quite doubtful whether the Court should not consider respondent's Speech or Debate Clause claim as a threshold issue. The purpose of that Clause, when it applies, includes the protection of Members of Congress from the harassment of litigation. Since the Court chooses not to consider this claim, and addresses only the cause-of-action issue, I limit my dissent accordingly. In doing so, I imply no view as to the merits of the Speech or Debate Clause issue or to the propriety of not addressing the claim before all other issues.

account the range of policy and constitutional considerations that we would expect a legislature to ponder in determining whether a particular remedy should be enacted. It fails to weigh the legitimate interests of Members of Congress. Indeed, the decision simply ignores the constitutional doctrine of separation of powers. In my view, the serious intrusion upon the authority of Members of Congress to choose and control their own personal staffs cannot be justified.[4]

I would affirm the judgment of the Court of Appeals.

---

[4] The justification the Court relies upon is the duty of federal courts to vindicate constitutional rights—a duty no one disputes. But it never has been thought that this duty required a blind exercise of judicial power without regard to other interests or constitutional principles. Indeed, it would not be surprising for Congress to consider today's action unwarranted and to exercise its authority to reassert the proper balance between the legislative and judicial branches. If the reaction took the form of limiting the jurisdiction of federal courts, the effect conceivably could be to frustrate the vindication of rights properly protected by the Court.