[ PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 13, 2008
THOMAS K. KAHN
CLERK

_____

No. 08-10810

_____

D.C. Docket No. 07-01392-CV-2-WMA

BLACK WARRIOR RIVERKEEPER, INC.,

Plaintiff-Appellee,

versus

CHEROKEE MINING, LLC,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(November 13, 2008)**

Before BARKETT and WILSON, Circuit Judges, and POGUE,[*] Judge.

BARKETT, Circuit Judge:

---

[*] The Honorable Donald Pogue, United States Court of International Trade, sitting by designation.

This is an interlocutory appeal certified to us by the district court. Black Warrior Riverkeeper ("Black Warrior") is a non-profit membership organization that supports enforcement of environmental laws for the preservation, protection, and defense of the Black Warrior River located in Alabama. Cherokee Mining, LLC ("Cherokee") is the owner and operator of two surface coal mines located in northern Alabama. Black Warrior sued Cherokee alleging that it had violated the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water Act")[1] and similar provisions of Alabama law. Cherokee moved to dismiss, arguing that Black Warrior's suit was barred by a provision of the Clean Water Act, § 1319(g)(6)(A)(ii), and thus should be dismissed for lack of subject matter jurisdiction. The district court denied the motion, concluding that another provision of the Clean Water Act, § 1319(g)(6)(B)(ii), lifted the bar that would otherwise have precluded Black Warrior's suit.

I.

The Clean Water Act was originally enacted in 1948 for the control of water pollution, and its enforcement authority was given primarily to the states. Federal Water Pollution Control Act, Pub. L. No. 80-845, 62 Stat. 1155 (1948) (current version at 33 U.S.C. §§ 1251–1387). Since that time Congress has amended the

---

[1] The Federal Water Pollution Control Act has been generally referred to as the Clean Water Act since 1977.

Clean Water Act on several occasions so that the enforcement authority for keeping our Nation's waterways clean is shared by the fifty states, the federal government through the Administrator of the Environmental Protection Agency ("EPA") or Secretary of the Army,[2] and private U.S. citizens.

In 1972 Congress established the regulatory framework that essentially exists today to protect our Nation's waters. Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92-500, 86 Stat. 816 (current version at 33 U.S.C. §§ 1251–1387). This legislation established a system of effluent limitations, water quality standards, discharge permits, and other regulatory mechanisms to be administered by the federal EPA and the various states in order "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

In addition to strengthening the involvement and enforcement authority of the federal government in water pollution control, the 1972 amendments enabled a private citizen, for the first time, to bring a civil action in federal court against any person or government that violated the effluent or limitation requirements of the Clean Water Act. Federal Water Pollution Control Act Amendments § 505(a)(1),

---

[2] The Clean Water Act gives enforcement authority for specified provisions of the Act to the Administrator of the EPA and Secretary of the Army. However, for purposes of this appeal when discussing the enforcement authority of federal officials under the Clean Water Act, we will refer only to the Administrator of the EPA or simply the EPA.

86 Stat. at 888–89; 33 U.S.C. § 1365(a).  By empowering private citizens to assist the federal or state governments in the enforcement of the Clean Water Act, Congress expanded the resources available to fight pollution.  The addition of the citizen-suit provision struck a balance between government and private enforcement by allowing citizens to bring suits against polluters, but not when either the federal government through the EPA or a state agency had "commenced and is diligently prosecuting a civil or criminal action" against a polluter in state or federal court.  Federal Water Pollution Control Act Amendments § 505(b)(1)(B), 86 Stat. at 888–89; 33 U.S.C. § 1365(b)(1)(B).

Congress made further amendments to the Clean Water Act in 1987 that, in relevant part, strengthened the Act's enforcement compliance provisions.  Water Quality Act of 1987, Pub. L. No. 100-4, 101 Stat. 7 (current version at 33 U.S.C. §§ 1251–1387).  It did so in part by permitting the EPA and states to assess penalties against polluters not only through existing civil suits or criminal sanctions, but also through a completely new administrative enforcement scheme.  Water Quality Act § 314, 101 Stat. at 46–49; 33 U.S.C. § 1319(g).  Like the existing limitation on citizen suits where the federal government or a state agency had commenced a civil or criminal action in the court system, Congress extended the bar against citizen suits when the federal government or a state agency had

4

commenced an enforcement action through the new administrative penalties process. However, in doing so, Congress reiterated its commitment to citizen suits, which a Senate Report described as "a proven enforcement tool," by lifting the bar against a citizen suit if either (1) it was filed before any administrative enforcement action commenced or (2) if the citizen had given notice of an intent to sue prior to the commencement of an administrative enforcement action and the suit was actually filed within 120 days of that notice. See S. Rep. No. 99-50, at 28 (1985).

## II.

The relevant part of the Clean Water Act precipitating this action pertains to the amount of pollutants that permissibly can be discharged into the Nation's waters. The National Pollutant Discharge Elimination System ("NPDES") provides that an entity that wishes to discharge pollutants into a particular waterway must obtain a permit from the Administrator of the EPA to do so. 33 U.S.C. § 1342(a). The Clean Water Act also authorizes the individual states to establish and maintain their own NPDES-permit program so long as it meets the standards set forth in the Clean Water Act and is approved by the Administrator of the EPA. Id. § 1342(b). Failure to comply with the conditions of either the EPA-issued or state-issued NPDES permit can subject a violator to either civil, criminal, or administrative enforcement proceedings and sanctions. Id. § 1319. Violations

5

of state-issued permits can be enforced by either the Federal Administrator of the EPA or the appropriate state authorities. Id.; see also id. § 1342(b)(7). Finally, violation of either an EPA-issued or state-issued NPDES permit can be subject to a civil action brought by a private citizen in the absence of appropriate federal or state enforcement as described above. Id. § 1365(a). In accordance with these provisions, the State of Alabama developed its own EPA-approved NPDES program, administered by the Alabama Department of Environmental Management ("ADEM"). Ala. Admin. Code r. 335-6-6 (2008); Ala. Code §§ 22-22-1 to -14 (2008) and §§ 22-22A-1 to -16 (2008).

Cherokee obtained permits from ADEM in order to discharge pollutants into the waterways surrounding its mining operations in northern Alabama. However, Cherokee violated the conditions of its permits by discharging excessive pollutants into nearby creeks and tributaries, including the Black Warrior River. Upon learning of the violation, Black Warrior, on May 16, 2007, notified Cherokee of its intent to sue as required by the citizen-suit provisions of the Clean Water Act.

Thereupon on July 20, 2007, ADEM began its administrative enforcement action[3] by advising Cherokee that its violations warranted a civil penalty and offering Cherokee the opportunity to resolve the matter through a Consent Order.

---

[3] The district court determined that this was the beginning of the state's administrative enforcement action. This is not an issue on appeal.

Seven days later, Black Warrior filed its citizen suit in federal court against Cherokee on July 27, 2007, within 120 days of its notice of intent to sue as required by the Clean Water Act. Soon thereafter, Cherokee agreed to the Consent Order proposed by ADEM, which provided that Cherokee and its parent company would be required to pay an aggregate fine in the amount of $15,000 for the violations at their mines. After the requisite thirty-day public notice-and-comment period provided for by Alabama law, the Consent Order was finalized on September 24, 2007.

Cherokee then sought to have Black Warrior's pending federal court citizen suit dismissed for lack of subject matter jurisdiction pursuant to 33 U.S.C. § 1319(g)(6)(A)(ii) which, as noted infra, precludes citizen suits when a state agency has commenced and is diligently prosecuting an administrative enforcement action against a polluter. Black Warrior responded by pointing out that the bar against its citizen suit was lifted by § 1319(g)(6)(B) because notice of intent to sue was given to Cherokee prior to the State of Alabama's commencement of its enforcement action and Black Warrior timely filed its suit within the requisite 120 days.[4] In reply, Cherokee then argued that the language of the exceptions provision, §

_____

[4] Black Warrior also argued in the district court that the § 1319(g)(6)(A) bar did not apply because ADEM had not "commenced" an action and Alabama's penalty statute was not a state law "comparable" to the Clean Water Act. Neither of these arguments are at issue in this appeal.

7

1319(g)(6)(B), should be read to lift the bar against citizen suits only when it is the federal government and not the state government which is pursuing remedies through an administrative enforcement process. The district court rejected Cherokee's argument and held that the exceptions provision, § 1319(g)(6)(B), applied to lift the bar against citizen suits when either the federal government or a state government was pursuing an administrative enforcement action. It then held that Black Warrior could proceed with its suit because it met the statutory notice of intent to sue requirements for the exception that removed the bar which otherwise would have precluded this suit.

III.

We review the district court's interpretation of a federal statute such as § 1319(g)(6)(B) under a de novo standard. Burlison v. McDonald's Corp., 455 F.3d 1242, 1245 (11th Cir. 2006). "In construing a statute we must begin, and often should end as well, with the language of the statute itself." United States v. Steele,147 F.3d 1316, 1318 (11th Cir. 1998) (en banc). So long as the words in the statute are clear and unambiguous, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54 (1992).

In doing so, we must keep in mind that "[a]s in all cases of statutory

8

construction, our task is to interpret the words of [the] [statute] in light of the purposes Congress sought to serve." Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co. of Va., 464 U.S. 30, 36 (1983) (quoting Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 608 (1979)). Here, Congress has clearly stated that the purpose of the Clean Water Act is to "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). We also recognize that Congress intended that these goals be accomplished by enlisting the resources and assistance of the federal and state governments and private U.S. citizens, as the Clean Water Act provides enforcement authority to each of these three entities.

To address the district court's subject matter jurisdiction, we must consider both the provision that bars citizen suits when the EPA or a state is pursuing civil penalties through an administrative proceeding, § 1319(g)(6)(A), and the provision that lifts that bar, § 1319(g)(6)(B). In relevant part, they provide as follows:

(A) Limitation on actions under other sections

Action taken by the Administrator or the Secretary, as the case may be, under this subsection shall not affect or limit the Administrator's or Secretary's authority to enforce any provision of this chapter; except that any violation–

(i) with respect to which the Administrator or the Secretary has commenced and is diligently prosecuting an action under this

9

subsection,

(ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection, or

(iii) for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law, as the case may be,

shall not be the subject of a civil penalty action under subsection (d) of this section or section 1321(b) of this title or section 1365 of this title.

(B) Applicability of limitation with respect to citizen suits

The *limitations contained in subparagraph (A)* on civil penalty actions under section 1365 of this title shall not apply with respect to any violation for which–

(i) a civil action under section 1365(a)(1) of this title has been filed prior to *commencement of an action under this subsection*, or

(ii) notice of an alleged violation of section 1365(a)(1) of this title has been given in accordance with section 1365(b)(1)(A) of this title prior to *commencement of an action under this subsection* and an action under section 1365(a)(1) of this title with respect to such alleged violation is filed before the 120th day after the date on which such notice is given.

33 U.S.C. § 1319(g)(6)(A), (B) (emphasis added).

Cherokee urges that the plain textual reading of the language

*"commencement of an action under this subsection,"* as used in the exceptions

provision of § 1319(g)(6)(B), is a narrow reference to only federal agency

administrative enforcement actions and not to state administrative enforcement actions. Specifically, Cherokee argues that because § 1319(g) addresses the administrative enforcement scheme to be followed by the EPA, the phrase "under this subsection" refers only to the federal scheme generally laid out in § 1319(g). We find Cherokee's interpretation of these provisions to be an extremely cramped and narrow reading of the ordinary and plain meaning of the relevant language.

As Black Warrior notes, the phrase "*limitations contained in subparagraph (A).....shall not apply [to bar citizen suits]*" in § 1319(g)(6)(B) expressly refers to all of the limitations against citizen suits described in § 1319(g)(6)(A). Section 1319(g)(6)(A) is divided into three sub-parts that explicitly cover both EPA-initiated and state-initiated administrative enforcement actions. The text does not state that the limitations contained only in subparagraph (A)(i) or (A)(iii) shall not apply, but rather makes reference without reservation to the entirety of subparagraph (A), which includes state actions. We thus find that the plain meaning of the phrase "limitations contained in subparagraph (A).....shall not apply [to bar citizen suits]" means that citizen suits are not barred when either the federal EPA or a state is pursuing an administrative enforcement action and the notice and filing requirements of § 1319(g)(6)(B) have been met.[5]

---

[5] Cherokee's narrow reading of the limitation in § 1319(g)(6)(B) arises, in part, because the phrase "under this subsection" is used, in other provisions of the statute, apparently to refer

Our reading of the ordinary and plain meaning of §1319(g)(6)(B) is consistent with Congress's stated purposes. The Senate Report accompanying the Senate's version of the proposed legislation that included the citizen-suit bar and exceptions provision reiterated that "[c]itizen suits are a proven enforcement tool. They operate as Congress intended – to both spur and supplement to government enforcement actions." S. Rep. No. 99-50, 28 (1985). The report further explains that the amending provisions accomplish Congress's goal by balancing "the need to avoid placing obstacles in the path of such citizen suits" with the avoidance of subjecting polluters to duplicate prosecution or penalties. Id.

Congress's desire to balance the rights of private citizens to bring civil suits

---

solely to federal actions. See, e.g., 33 U.S.C. § 1319(g)(6)(A) (differentiating between actions by federal officials "under this subsection" and actions by states under state law "comparable to this subsection"), 1319(g)(7) ("No action by the Administrator or the Secretary under this subsection..."), 1319(g)(8) (provides judicial review for "[a]ny person against whom a civil penalty is assessed under this subsection" but only in federal court ). But the presumption of uniform usage may not apply where, as here, the different statutory provisions each serve a specific purpose. See Gen. Dynamic Land Sys., Inc. v. Cline, 540 U.S. 581, 596, 124 S. Ct. 1236, 1245-46 (2004) ("The presumption of uniform usage thus relents when words used have several commonly understood meanings among which a speaker can alternate in the course of an ordinary conversation, without being confused or getting confusing."). Moreover, even if the court were to adopt Cherokee's narrow interpretation of "under this subsection" to describe only actions by certain federal officials, still the notice and filing requirements of section 1319(g)(6)(B)(i) would be met to lift the citizen-suit bar and Cherokee's motion would therefore be denied. Black Warrior both gave Cherokee notice and filed its action "prior to commencement of an action under this subsection," as required by section 1319(g)(6)(B)(i), that is, prior to the filing of a federal action. Nothing in section 1319(g)(6)(B) states that the exception to the bar does not apply in cases where state enforcement action has commenced prior to a possible federal enforcement action. Instead, subsection (g)(6)(B) reads that the limitations in subsection (g)(6)(A) refer to "any violation."

12

with the avoidance of duplicate prosecution against polluters illustrates its intent that citizen suits should be allowed to proceed in the absence of government enforcement. A reading of § 1319(g)(6)(B) that is consistent with lifting all of the limitations against citizen suits in § 1319(g)(6)(A) accomplishes the goal of not placing obstacles in the way of citizen suits. Moreover, § 1319(g)(6)(B) operates in such a manner as to maximize the limited resources of the federal EPA, states, and private citizens as enforcers and guardians of the Nation's waterways. See Davis v. Passman, 442 U.S. 228, 241 (1979) ("Statutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition who may enforce them and in what manner.").

IV.

We conclude that, in accordance with the plain and ordinary meaning of § 1319(g)(6)(B), all of the limitations against a citizen suit as provided for in § 1319(g)(6)(A), which include federal and state administrative enforcement actions, are lifted so long as § 1319(g)(6)(B)'s notice and filing requirements are met. Because Black Warrior gave its notice of intent to sue Cherokee prior to ADEM's commencement of its administrative enforcement action and Black Warrior filed this suit in federal court within 120 days of its notice as required by §

13

1319(g)(6)(B)(ii), the bar against Black Warrior's citizen suit is inapplicable.

Accordingly, the district court did not err in denying Cherokee's motion to dismiss for lack of subject matter jurisdiction.

**AFFIRMED.**